number 181038 Pheromone Cunille et al. versus the Council 93 AFS CME et al. I was looking for my brother on the other side, your honor. I saw him earlier but I don't see him at the moment. Shall I proceed? Let's wait a minute, there's still people coming in. Will the court officer call for Mr. Stern, Attorney Stern? Thank you. Sorry, your honors. I was going by the schedule, I apologize. Mr. Kelly, whenever you're ready. Thank you, your honor. Good morning. Together with my I'm Paul Kelly and we represent the American Federation of State, County and Municipal Employees and its New England affiliate AFSCME Council 93. My clients take appeal from a district court order that violated the policy against judicial interference in the affairs of labor organizations. The district court not only adjudged the composition of local Council 93's executive board to be unlawful, but ordered extraordinary relief. I would like this morning to address the statutes under which the claim was brought. The structure of Council 93, the equitable relief ordered by the court, and with time the counterclaim of AFSCME. Your honor, respectfully, I'd like to reserve two minutes if that's appropriate. Thank you. The prime statutory basis for this case is the Labor Management Reporting and organizations, but also preserved a wide berth for union self-governance. The second statutory basis for this claim was the Labor Management Relations Act, the LMRA. The LMRA provides that contracts that labor organizations are party to are enforceable in federal court. The theory here was that the AFSCME Constitution was such a contract. I would focus first on the overarching policy of judicial non-interference in the affairs of labor organizations as something this court has endorsed numerous times. Dow v. the Carpenters, Local 48 v. the Carpenters are both examples of this court's deference to the internal workings of unions. Does that rule have any exceptions? Does the rule have exceptions? Yes, your honor. There are requirements that are baked into the LMRA that unions don't have the freedom to alter. When it comes to requirements, for example, local unions, you have to elect your officers every three years. Intermediate organizations every four years. That's because the statute says so. So clearly, if you're a local union and you say your president is going to be there for five years, that violates the statute. Could you help me with a factual point here? When I read your Constitution for Council 93, Article 5, Section 4 gave me the impression that there is equal proportional voting for the delegates to the convention of Article 93 and that the convention is the ultimate rule-setting authority for Council 93. That's if the convention then dictates the rules for who gets on the executive board and what powers the executive board has? Well, so the delegates to the convention elect. There's no, and I think it was part of your question, the delegates to the election are elected by the local unions. They each send so many delegates to the convention. The convention will elect vice presidents from the various legislative districts. So the legislative districts in Council 93 are either geographical or they are work-based, essentially. So Suffolk County gets so many delegates, the local unions from Suffolk County will elect the delegates. The delegates from the local unions from Suffolk County will elect those delegates and so on. Each legislative district, the vice presidents are elected from the delegates who are from the local union delegates who are from that particular district. Now, the Constitution specifies what the districts are and how many seats the various districts are entitled to get. And who has the power to change the Constitution? The convention does, as I understand it. Yes. As a matter of fact, the Constitution specifically provides that two-thirds of the delegates have to do it. Now that may explain why it is, as Judge Young pointed out, a hodgepodge of historic deals. It's difficult to change a Constitution, but it should be, frankly. This is not something that ought to happen all the time. Two-thirds of the delegates need to do it. If there's a good reason to do it, if a new bargaining unit of New Hampshire State employees, for example, were to come in, they may say, well, I'd like to have a seat. And the delegates would have to decide whether we should amend the Constitution to provide that. So, those are the two structures. There are officers of Council 93 who are elected by all the delegates. The point here that the plaintiffs made and that the district court adopted is that the executive board should reflect proportions of the membership. It should be proportionate. So if a particular district has 2,000 members, then another district and it has two executive board seats, then another district with 2,000 members should have that many seats. Does the Bill of Rights of the Statutes you refer to have any language that deals with this situation? I'm sorry, the Bill of Rights of what, Your Honor? Of the Statutes. Well, the Bill of Rights of the LMRDA is embodied in Title I. And it says you as a union member, an individual member, have equal rights to vote, to attend meetings, to express your opinions. It says you have freedom of speech in assembly. It says you shouldn't be disciplined without due process. So Title I specifies a union member's Bill of Rights. And it also has a provision that if you're denied those rights, you can come into court. Are they claiming that they don't have equal rights because their vote is watered down when it comes down to the entity that runs the union between these conventions? Precisely. That is their claim. Then what's wrong with it? Back in 1964, I view that, Your Honor, as a facial attack on the composition of Council 93. Okay? If it's a violation of my rights as a member, it's a violation of everybody's rights. Why do you say attack on Council 93? It seems to me they're attacking the composition of the Executive Board. Correct. No, the Executive Board of Council 93. But Council 93, they've all got equal voting rights for. The ultimate power here is the convention. Correct. Correct. But the argument is the Executive Board, which is subservient to the convention, ought to be composed differently. Fair enough. But it is not an individualized harm that any member has suffered. Everybody's got the same beef if the Executive Board is improperly composed. Calhoun v. Harvey. This is a case in which there were restrictive nomination provisions. You had to have been out at sea for two years. You had to have been a member for five years. You had to nominate yourself. Those were in the Constitution. And the plaintiffs brought a Title I action saying that's discriminatory. They didn't say that's discriminatory. They said that's right. But the remedy is Title IV. Title IV is about elections. Title I, and Calhoun says this very specifically, that's if you get discriminated against. If you as an individual are discriminated against, somehow you're denied your right to vote. Not if you're making a facial challenge on the Constitution. That's what's going on here. These people were not any different than any other member of Council 93. But it seems to me that a certain group has more representatives in the entity that runs the union between these sovereign entities. Right. That you are made discriminated because your vote counts less. I understand that, Your Honor, and I agree. There's a certain facial appeal to the notion that, oh, we ought to do it proportionally. Well, I would say a couple of things in response to that. Number one, we may not be doing anything but adjusting our executive board if that's the standard to which we're held. In the cases we've cited, the 10th Circuit, the 8th Circuit, the 7th Circuit, they've all rejected that. There is no requirement of proportional representation. It's for the union to decide. It's for the delegates to the Convention to decide. And if they decide it should be changed, well, it should be changed. Let me just explore that in terms of how far that goes. Everybody gets equal right to vote for the Convention. The Convention delegates then get there. Could they decide, we want to be run more efficiently, so instead of having an executive board, we're going to have an executive team that will do the subject to our Constitution in accordance with rules that we lay down. They'll manage us, and we'll meet every year and see how they're doing. Well, I believe that would be, that would not be prohibited unless the, and I'd have to check, it's the AFSCME Constitution, the Internationalist Constitution that governs and that might say you can't do that. But if that didn't trump that, then you're saying they could do it. That would mean nobody got to vote for the manager who would be appointed by the Convention where everybody was equally represented and voted. That's right. Or they could say, we want a three-person executive board. This one happens to have 35 people. You know, and the advantage of this... You know, you can have all kinds of hypotheticals. The fact is that they're not the facts in this case. The facts in this case, as I understand the record, is that groups that had, say, 100 people were able to elect five representatives, while groups that had 1,000 people only elected one or two. And obviously, those are not the facts, but I'm using that as an example only. Yeah, no, no, there's no question, Your Honor, that disproportion exists in the relationship between the members, the underlying members, and the seats on the board. There's no question about that. But, I will say this. In all the cases where that is being challenged, it is being challenged by the large locals. They're saying, we don't have enough votes. If you look at the cases from the Tenth Circuit, which is Gordon, Gordon versus the laborers, they had, I believe they had, I'm sorry, they had 659 members out of 2,400. You would say, oh, they should have 25% of the votes. They didn't get it. They only got a small slice of the votes. And so, and so the point is, and just let me, there's a DOL regulation, which, in my opinion, solves two problems. One, it says there's no requirement of proportional representation. There is no indication that Congress intended in enacting Title IV of the Act to require representation in delegate bodies of labor organizations to reflect the proportionate number of members. That's one thing it says. There's no requirement. Congress never intended that. Matter of fact, Senator McClellan proposed that as part of Title I. It was never adopted. The final thing I will say is this, the last sentence of that regulation says, all members must be represented. The union may not deny representation to locals below a certain size. The idea is small locals have a right to be heard. On this particular executive board, they do. On a proportionally based one, they're less likely to. Thank you, Your Honor. Good morning, Your Honor. My name is Mark Stern. I represent the plaintiffs' appellees in this case. And let me just say the first thing, as Your Honor pointed out, this is not a case about strict proportionality. This is not a case about proportionality. The other circuit cases are all cases where a large group got one delegate and a smaller group got one delegate. This is a case where one group with 4,500 members get four delegates. Another group with 2,500 members gets seven representatives on the board. And another group with the exact same number gets one. And finally, a group with a large number of non-members, which is an issue they brought into the case. I didn't. I did it on membership. But they brought in, well, what about the non-members, has 10,000 members and gets one representative. Here's where I'm having trouble with that, though, is I understand the facts. All the members, each having an exactly proportionally weighted vote, have decided that this is the way we want our executive committee. Yes. And so the question becomes, can a, through a democratic process, a group decide under the LMRDA to operate undemocratically? At a subsidiary level. At an intermediate level. And the point here is, Your Honor, that when you go to the convention, my clients, who are in DDS, they don't get to vote equally for each member of the executive board. They get to vote only for four members of the executive board, the DDS delegates. So their vote is diluted as compared to the other states. But if the convention wanted to change that, a democratically elected convention could change that? It could say proportional voting? It could say we're just going to have three people on the executive board? Yes, it could, Your Honor. But it could not say there are 10,000 delegates. 1,000 of those delegates will elect two people to the board and the other 9,000 delegates will get to elect one. That is the case before this court. That is not the case before the other circuits. That is not the case that was argued by my brother. That is the case before this court. And the question is, does that dilute the votes? Now, the second point here is, Your Honor, that in the example that if it was 10,000 and they were going to be, if it's 10,000 and they get one delegate, and 1,000 and they get one delegate, that is rash. There's an explanation for that. Each group gets one and there's a formula for it. Each of the two groups, each get a delegate. In this case, it's admitted that there's no formula by which this has been established and that there's no rationale for explaining it. And the Constitution requires, not the term we put the suit on, but the term they said actually applied, our term didn't, says it has to be fair and democratic. And it just isn't fair and democratic to have 10,000 people and 9,000 of them get one delegate and 1,000 get two. It's not fair and democratic. There's no explanation for it. There's no rationale for it. And the Lanham-Griffin puts requirement, takes away autonomy from unions when they violate the rights of their members. And this is a irrational, discriminatory violation of the rights of their members. You obtained from the district court an order requiring proper, I think it's proper proportional representation. And you said at the outset, this is an important proportionality case. So what are we supposed to do with that order? Well, I pointed out in the record any number of times that the judge interpreted his own order to say, I'm not requiring strict proportionality. He said that a half dozen times. Yes. So what are we supposed to do? Well, I mean, it's plain he's not going to interpret his own order to require strict proportionality. He's going to require that gross disproportionality where the minority are given more representation than the majority to be cured. And he suggested, if you don't cure that, that all of your actions for the present year avoid. And I respectfully suggest to the court, we are not supporting that portion of his order. That is, we are looking for relief for the next election, which Calhoun said we could only get if we're showing discrimination. And we are showing discrimination. Certain groups are given less voting power than other groups. How is that? How is the if I'm a convention delegate looking at Judge Young's order and I'm saying, OK, it says proportionate, but then in a transcript, he says, I don't really mean proportionate. And that's what the lawyers are saying. But he said proportionate. And now they're saying, just don't be grossly disproportionate. How the heck do I know what is where on the spectrum does the line cross from what my client presented a proposal at the judge deferred in October? Your client is the opposing party. I'm a delegate thinking I want I don't want to be proportionate. I can be disproportionate, but I can't be grossly disproportionate. I don't know how to comply with this court order. Well, I think the question before the court is twofold. One is, is it was it sound for the court to ask for this situation to be remedied under the Bill of Rights and under the Constitution of the Union? And the second question is, should the court more artfully express itself in its order? And the answer to the second question is, yes, it should. It should be more clear to the delegates at what they have to do. And I don't have any problem with that. I would like to just touch a few more points quickly. One is the standard of proof here, which is required for them to put into their briefs. The standard of proof here on is it unequal? Is it undemocratic? Was exhaustion futile? Was exhaustion sufficient? And the like questions is clearly erroneous. And the standard of proof on whether to acquire exhaustion, as Judge Torea knows particularly well, is abuse of discretion. So that's one thing that I did want to just quickly point out. The second thing I wanted to quickly point out. To your second quick point, let me go to my quick point. Have you gentlemen tried to settle this situation? It seems to me from what I heard, opposing counsel, there doesn't seem to be that much disagreement as to the principle. And it seems to me what you are lacking is how to put it into effect. It's right opposing counsel. The opposing parties have objected to the principle entirely, Your Honor. They have said that they are no obligation whatsoever to make this rational, democratic, to explain themselves, to have it go by a formula. That is the problem. So has this case ever gone to our settlement counsel? Yes, Your Honor. It was rejected by the defendants. And it is really odd for two union groups to be asking the government to intervene and enjoin one of them to do something. Well, it's not because if you read the preamble to the Land of Griffin Act, it becomes necessary in certain circumstances. And this is one of them. I just like to quickly negotiate all the time. So I would think that negotiation would be the way to go in this one. But one would think so. But, Your Honor, my clients brought this, tried to bring this before the convention in 2013 and 2017. And in both instances, they weren't even allowed to speak. And they attempted to bring it through other processes. But the Constitution has a, I just want to touch on exhaustion really quickly. If you look in the Constitution, there is only one remedy available to a member for exhausting a claim that a subordinate body is operating in violation of the Bill of Rights of the Constitution. And that is to advise the president. That is Article 38, I'm sorry, Article 9, Section 38. My client did this in writing in 2013 in Exhibits 6 and 36. He cannot do anything more than that. Under that provision, it's the obligation of the international to do an investigation or hold a hearing. And what they did, and the record shows this, is they said, no, we'll send it back to the wrongdoer and let them look into it. So that's the exhaustion question. And, you know, there isn't a strict adherence to self-government in unions. There are limitations placed upon it. And one of the limitations is in Title I, equal voting rights. And you have to have a system that is rational, explainable, and by a formula to pass that test. And what should the district, you said the district court could have been more specific. Yes, Your Honor. What could it say that would define the difference between disproportionate and grossly disproportionate? You must restructure the executive board, which essentially runs the union, spends the $17 million and hires the 50 staff people. You must restructure it so that no person in the union is given less representation than another person who, one entity is given less representation than another entity that has fewer members. Now, that doesn't mean they have to be given the same equal representation. It means you could establish 13 legislative districts and have them each have one, which is what's happened in other cases. That seems to go against what you argued, because you have 13 districts and you give each one, all the districts would have to have the same population. No, no, no, no. The districts could be rationally identified. They claim we're doing line drawing, border line drawing. We're not, Your Honor. There's a district with 10,000. There's a district with 4,500. There's several districts with 2,500. It would be within the bounds of rationality to give them each one representative or two representatives, or to say the larger districts, which is the Gordon case, the larger districts get three and the smaller districts get two. Those were all rational. Those were all democratic to some degree. Those are all within the penumbra of what a union can decide for itself. But to decide to give the minority more representation than the majority, it doesn't pass any test. You have to slow down so that the judges can ask questions. I'm very sorry. Couldn't that be more disproportionate than what you have now? If you had 13 districts and one of them had 10,000 and one of them had 1,000 and they each got one, that would be more disproportionate than what you have now. Your Honor, there was a case, one case out there, I think it's Kenporn, where such a situation existed and those cases were basically decided before Crowley and they were dismissed as title one. You can't force title one on an election matter, even pre-election. But the answer is it's possible and it's possible that a challenge to that would succeed or a challenge to that would not succeed. But back to how the heck are they to know what they, all right, one out of 10, one to 10 ratio, you're saying might not work, but how about a one to five ratio? Your Honor, we're not dealing with ratios here. We're dealing with inverse ratios. That is this case. Well, you know what I mean. And when one's got 1,000 and another's got 5,000, they each get one delegate. Yes, Your Honor. That might be okay. That is, well, you're not deciding that case with all due respect. And I'm not arguing that case. I'm arguing where the small one gets five and the large one gets two. And I'm saying that's undemocratic and it's dilution of equal rights where there is no explanation for it, no formulation for it. It's completely just packing, you know, the executive board with people that they like or people of a particular color or whatever. We're trying to explore the premise that you're correct in what you just said, but then how does that possibly get implemented by an order and what type of order should do it? And that's where we're having trouble because when you simply say this situation is no good, it seems not good policy to then tell the union to play 20 questions and guess again, and then we'll let you know whether that's good or not. It's a challenging matter to fashion an order. It is not a challenging matter to determine that this system is undemocratic and dilutes the voting rights. And I would respectfully suggest, your honor, that we could work together below to fashion an order that would be acceptable, hopefully, to the defendants and the plaintiffs if the court determines that the present system, that the court below did not have used its discretion, did not clearly erroneously find that this system is not acceptable because it is unequal in an irrational and unexplicable direction. That is the question. And I do, might come before you in another 28 years, your honor, Doty, I might come before you with a case resembling Kemphorn and say it needs to be more proportionate than that. But that is not the case before this court, and that is not the case it's ever been. And this law has existed for 60 years, and there's never been a case where a disproportionality was so great that the minority was given control over the affairs of the majority. Is there some committee that's been formed as a result of the convention meeting that's supposedly exploring this, or is that a dead end? Well, my understanding is that there was such a, something of that nature discussed, and also something discussed about this fall's constitution, I'm sorry, this fall's legislative meeting be converted to a constitutional convention to address the matter. That did not occur. The legislative meeting occurred, it wasn't converted to a constitutional convention, so the matter has not been addressed. And when's the next session of the convention? The next session is when the next executive board will be elected, which is why we brought this suit two years in advance of that, so that we could not have to wait another four years before we have a democratic executive board. We're not seeking retroactive relief of any nature, we're not challenging the last election, we are doing what the court in Crowley at my suggestion said a plaintiff can do, which is seek a remedy pre-election that can be taken care of and implemented in advance of the election, it wouldn't delay the election. The next convention is November 2019, that is when the election is going to occur. I hope I've answered your question. So, if you are to prevail in a meaningful way, you need some order that the constitution get changed before November of next year? Yes, it's probably October or September when the nominations are made. So you would need for there to be a constitutional convention? Convened, which they said in their response to the court below, they could do at any time if they needed to. It would be just a matter of cost, they said. Can I just say one word about the counterclaim, your honor? There's an appeal separate from this, which will determine the issue in the counterclaim. We have said we will turn over all the funds that we held at the time of the deactivation in the third week of June, if we are determined to be dissolved properly, and if we're not, then the court will have to decide. That is a separate appeal. It seems inappropriate at this time to resolve the counterclaim when there's no dispute about it. Essentially, we've said we will comply if we lose that appeal, and if we win that appeal, then those funds belong to us. And there's just nothing to order, which is why the court dismissed it as moot, because we had an agreement as to how that would resolve. Could the internationals step in and do something here that would cure this? Do they have the power? Oh, they do, and they did, and we brought it to their attention in 2013, and the president was obliged under Article 9, Section 38 to do either an investigation or convene a judicial panel to fix this, and he declined to do so, and in fact, sent it back for the offending party to resolve. And that is the only provision in the Constitution, and it's mandatory. The president was required to do something in 2013 about this, and he did not. I assume it was a he then, I don't know. Thank you. Thank you, Your Honor. A couple of points, Your Honor. Number one, I didn't communicate this very well when I stood up here earlier. The prime argument here is that this is a Title IV case, it's not a Title I case. If we say any union member anywhere in the country has the right to file a federal suit challenging the composition of his or her executive board, we'll have created a cottage industry. That's not the way it goes, Your Honor. The Secretary of Labor, under Title IV, runs all elections. If you have a problem with the 2015 election of executive board members in Council 93, you go through your internal processes, there is exhaustion, you go to the Secretary of Labor. If the Secretary of Labor comes in and says, this is undemocratic, the Secretary of Labor will then go into court, and we can deal with the Secretary of Labor. We can't deal with 36,000 individual plaintiffs who all get to say, I don't like this and Judge, you've got to change it. The Floodgates argument is a pretty good argument why Title I should not, and Calhoun said this. This is more than 50 years ago. If we disagree with you and we say it is a proper Title I suit, what is your response to the district court's holding that you need a neutral principle and you don't have one? If we say, if you say it is a Title I case? That it is a proper Title I case, right? If we disagree with your point that it is a Title IV case? Then I argue that the relief, which is to order proportionality, is... You don't disagree that there is no neutral principle that has been advanced in this litigation too? Well, the neutral principle, if there is a neutral principle, it's just like... I'm asking you if you have advanced... We certainly advanced the principle, your honor, that small locals are entitled to be represented even if it requires disproportionate allocation of seats. Rhode Island gets two senators. California gets two senators. Why? That's because historically... Rhode Island doesn't get five. I'm sorry? I think what they're saying is here Rhode Island is getting five and California two. I think that's what they're saying. Well... But that's the point. Would you please address Judge Cayatta's point? The way this has evolved over time, one thing I would say is two-thirds of the convention delegates is a lot to change. What they did change in this particular dispute, this particular dispute does not involve Vermont and New Hampshire. It was just this little subsection of Council 93. Years ago, Massachusetts employees were employed by the Department of Mental Health. And there were eight delegates. And nobody said that's too many, that's too few. The Department of Mental Health, in the fullness of time, became the Department of Mental Retardation. And for years, both of those departments got four. Even though the Constitution didn't say that. With due respect, I haven't heard you answer the question. What's the neutral principle that would give the smaller units, not just representation, but actually more absolute delegates than larger units? Is there a neutral principle that explains that? Well, I don't know if this explains it, Your Honor. But I draw your attention to Exhibit 41 in the case. The unit of membership is not individual members. It's local unions. And if you look at that document, you'll find some of these districts have 25 locals. Others have two or three. If you limit the small locals to one seat, because collectively they only have a thousand members, then you're not giving small locals sufficient voice. We've used up your rebuttal time in this. Did you have a final point? Are you all set? The only other point I would raise, Your Honor, is that we are under an order to do something by September 31st, 2018. And we move to stay the order, pending resolution of the appeal. So I think there's two issues. One, is the judgment accurate that this violates the law? And two, is the equitable order proper that we have to amend the Constitution in the way the judge said, and the members have to vote on it? We move to stay that order, and it was, I think it was dismissed without prejudice. As to the counterclaim, do you agree with Brother Counsel that we needn't deal with it? Well, I understand. I'm happy to hear that. But the order of the district court was that the termination of Local 402 was consistent with the law. And it was my understanding that upon that determination, the assets should have been turned over to the international. So is there a possibility that the two sides will put their heads together on that issue, or you just want us to take it as it's been submitted? Well, I think fairly, Your Honor. Well, you don't need to answer that now, but obviously the opportunity is there if you decide to talk about it. Your Honor, I have a personal question for you, Your Honor. They answered discovery, and they swore under oath in the trial proceedings that there was no neutral principle. This is a different topic. I'm sorry I asked. I'm sorry. I'm sorry. Thank you. May I speak to it for one second? We're all set. Thank you.